No. 32,276

CLIFFORD LATHROP, *Appellant*, v. STANDISH HALL, C. H. BROOKS, WILLARD BROOKS, D. W. BASHAM, ˙J. O. DAVIDSON, ANNA M. SMYTH, as Executrix, etc., D. W. THOMPSON, C. E. WEBB, E. LE-MOYNE MASON and MAX HOUSTON, *Appellees*.

(44 P. 2d 201)

Opinion filed May 4, 1935.

*Austin M. Cowan, C. A. McCorkle, J. D. Fair, W. A. Kahrs* and *R. H. Nelson,* all of Wichita, for the appellant.

*C. H. Brooks, Willard Brooks, Howard T. Fleeson, Fred W. Aley, Carl G. Tebbe, Wayne Coulson, W. D. Jochems* and *J. Wirth Sargent,* all of Wichita, for the appellees.

The opinion of the court was delivered by

HUTCHISON, J.: The appeal in this case involves the sufficiency of the allegations of the two counts of the petition.

There are several defendants, one of whom filed a general demurrer to the first cause of action in the petition, and all the other defendants filed an answer to the first cause of action and then filed a motion for judgment for the defendants on the pleadings. All the defendants filed general demurrers to the second cause of action in the petition. The trial court treated the motion for judgment on the pleadings as a demurrer to the first cause of action, and after argu-

ment the court sustained the demurrers to the first cause of action and overruled them as to the second cause of action. The plaintiff appeals from the ruling sustaining the demurrers to the first cause of action, and the defendants appeal from the order overruling their demurrers to the second cause and have served notice of a cross-appeal on that ruling.

The demurrers to each cause of action are on the ground that the petition does not state facts sufficient to constitute a cause of action.

The answer to the first cause of action is set out in the abstract, but there is nothing in the record to indicate that the trial court took it into consideration in sustaining that part of the defendants' motion for judgment on the pleadings, which was treated as a general demurrer.

The first cause of action in the petition in substance alleged that the plaintiff is a citizen and resident of Burns, Kan., and the defendants and each of them at the times hereinafter mentioned were duly elected, qualified and acting directors of the Guarantee Title and Trust Company, a banking corporation duly organized and existing under and by virtue of the laws of the state of Kansas.

That on July 1, 1929, the plaintiff was the owner and holder of $11,000 of bonds, and on that date he deposited the same with the Guarantee Title and Trust Company as collateral security to the note of J. C. Powell, dated July 1, 1929, and due July 1, 1930. That thereafter, and on or about the 18th of December, 1929, without the knowledge or consent of this plaintiff, and without the consent of Powell, the Guarantee Title and Trust Company wrongfully sold the bonds to the International Mortgage Trust Company of Topeka. That the fair and reasonable value of the bonds at that time was the face value thereof with accrued interest. That at that time the Guarantee Title and Trust Company was insolvent and known to the defendants to be insolvent and had no authority to sell or dispose of the bonds pledged as collateral security, and that all such facts were known to the defendants or by the exercise of ordinary care should have been known to them.

That at all these times the said Guarantee Title and Trust Company was a banking institution within the purview and meaning of sections 9-163 and 9-164 of the Revised Statutes of Kansas, 1923, and was engaged in receiving deposits subject to check and on time, and engaged in the loaning of money and doing a general banking and trust business, with its place of business in the city of Wichita.

That the Guarantee Title and Trust Company had been insolvent and in failing circumstances from a time prior to July 1, 1929, and up to August 7, 1930, on which latter date the bank commissioner of the state of Kansas took charge of the institution and closed the same so that it ceased to do a banking and trust business and ceased paying any amount on indebtedness due its creditors, and its liabilities exceeded its assets by the sum of $300,000.

That defendants were not only duly elected, qualified and acting directors of the banking institution during all the times heretofore mentioned, but held themselves out to the public and to the plaintiff herein as such.

That $11,000 of the principal of the note to which the bonds were collateral was paid on June 30, 1930, and by agreement with the Guarantee Title and Trust Company the bonds were to be released and delivered to this plaintiff, and the balance of the note was paid to the institution long prior to the filing of this action.

That this plaintiff did not know of the insolvency of this banking institution at any time prior to August 6, 1930, and he pledged the bonds as collateral, and defendants assented to the creation of the debt herein mentioned by such banking institution after having knowledge of the fact that it was insolvent and in failing circumstances. That the plaintiff thereafter made demand for the value of the bonds or their return, but such demand has been refused, and plaintiff has not sold or assigned or transferred his right to the bonds or the cause of action herein set forth, and he is still the owner of the bonds.

That the bonds were negotiable instruments payable to bearer, and the International Mortgage Trust Company paid value for them without knowledge of the rights of the plaintiff, and has, prior to the institution of this suit, disposed of the same for a valuable consideration to a holder in due course, and that plaintiff is unable to recover the bonds without payment of principal or face value thereof with accrued interest.

The appellant maintains that the first cause of action sufficiently alleges and shows that the Guarantee Title and Trust Company was a banking institution within the provisions of R. S. 9-163, and that the transaction set up in the first cause of action constituted the creation of a debt within the meaning of that section. In order to consider the last proposition first, let us assume, but without so deciding, that the Guarantee Title and Trust Company was a bank-

ing institution within the provisions of R. S. 9-163, and under such premises consider whether or not the transaction set up in the first cause of action constituted the creation of a debt within the meaning of R. S. 9-163, which is as follows:

"It shall be unlawful for any president, director, manager, cashier, or other officer of any banking institution, to assent to the reception of deposits or the creation of debts by such banking institution, after he shall have had knowledge of the fact that it is insolvent or in failing circumstances; and it is hereby made the duty of every such officer, agent or manager of such banking institution to examine into the affairs of the same, and, if possible, know its condition. And upon failure of any such person to discharge such duty, he shall, for the purpose of this act, be held to have had knowledge of the insolvency of such bank, or that it was in failing circumstances. Every person violating the provisions of this section shall be individually responsible for such deposits so received, and all such debts so contracted. . . ."

The appellant calls our attention to the fact that while the statute above quoted used the terms "the creation of debts" and "debts so contracted," the succeeding section having to do with proceedings under the former section uses the phrases "debt so created" and "creation of such debt." The appellant maintains that there arose an implied contract that the Guarantee Title and Trust Company would pay this money to the plaintiff when the note to which the bonds were pledged as security was paid, which was done on June 30, 1930, and at that time there was created a debt.

Appellant cites *Abernathy v. Loftus*, 95 Kan. 87, 147 Pac. 818, where under the old statute (Gen. Stat. 1889, § 1204), making trustees of corporations liable to the extent of their stock for debts of the corporation unpaid, it was held an implied obligation was a debt unpaid.

*State, ex rel., v. Toy*, 138 Kan. 166, 23 P. 2d 601, is also cited, and the meaning of the words "debt" and "obligation" used in the cash-basis law are made applicable thereunder to implied debts or obligations.

The case of *Farmers State Bank v. Callahan*, 126 Kan. 729, 271 Pac. 299, was where the estate of a deceased stockholder in a bank was permitted to be sold to satisfy a judgment against her estate for liability on her bank stock occurring during her lifetime.

Appellant also cites *Lipscomb v. Bank*, 66 Kan. 243, 247, 71 Pac. 583; *Challiss v. Wylie*, 35 Kan. 506, 11 Pac. 438, and 1 C. J. 1033 to show that where benefits have accrued to the wrongdoer there exists an implied contract of which the party injured may avail himself by waiving the tort and suing upon the implied contract.

If the statute here involved had used the word "debt" only, we could very easily construe it as applying to an express or implied debt or obligation, or one arising out of a tort, or, as in the Abernathy case, *supra*, a "debt unpaid," but we cannot and must not conclude that the legislature ascribed no significance to the qualifying words used in the section under consideration in connection with the word "debt." If we read this statute correctly, there are only two things that the officers of a banking institution can do, after they have knowledge that the institution is insolvent or in failing circumstances, that can make them liable under this statute, and they are "to assent to the reception of deposits or the creation of debts by such banking institution." Later in the section occur the words "all such debts so contracted." So we must give some significance to these two qualifying words, "created" and "contracted," unless we want to say that all debts are created and contracted.

In the case of *Henley v. Myers,* 76 Kan. 723, 93 Pac. 168, the sections of the old law (now repealed), imposing a liability on stockholders of every corporation except railroads and those organized for religious or charitable purposes, were construed particularly as to whether or not in such protection for creditors of the corporation it extended to the owner of a judgment founded on tort, and it was held that the owner of such a judgment was a creditor. In the opinion, after referring to many decisions and distinctions drawn between creditors holding obligations originating in contract and those whose demands arise out of tort, it was said:

"Nearly all of these cases are controlled by one or the other of these two reasons: . . . (2) that the statute uses some expression beyond the mere word "debt"—for instance, "debt contracted"—indicating that only contractual obligations are within its purview." (p. 728.)

This opinion is cited in the Abernathy case in its construction of the term "debts unpaid."

The second reason given in the Henley case applies in the case at bar, as the statute uses some expression beyond the mere word "debt."

The contention that an implied contract arose and created a debt when the securities were not returned is not in complete harmony with the further limitation of the statute to cases where the officers "assent" to the creation of debts. An assent is pleaded but it will not make an implied contract, which is defined to be a contract in-

ferred to have been intended by the parties to it by their acts. (Webster's New International Dictionary, 2d ed.)

We have no hesitancy in concurring with the conclusion of the trial court that the first cause of action does not state facts sufficient to constitute a cause of action against the defendant officers of the trust company on their assent to the creation of a debt due the plaintiff, and the demurrers to the first cause of action were properly sustained.

For his second cause of action the plaintiff repleads each and every allegation in his first cause of action as far as the same may be pertinent and relevant, and further pleads as follows:

"1. That the defendants herein, and each of them, were in direct charge of the affairs of said the Guarantee Title & Trust Company at all the times herein mentioned and were the managing agents and directors thereof. That in addition to holding the office of directors, the defendant C. H. Brooks was chairman of the board of said banking institution, the said Standish Hall was president of said banking institution, the defendant C. E. Webb, also known as Carl E. Webb, was vice president of said banking institution and the defendant J. O. Davidson was treasurer of said banking institution and that all of said persons so named were the duly elected, qualified and acting officers of said banking institution at the times herein mentioned, and were the executive officers and together with the directors mentioned as aforesaid were the managing agents having active management, charge and control of said banking institution at all the times herein mentioned.

"2. Without the knowledge of the plaintiff, the said bonds deposited at the time specified in the first cause of action, were, as plaintiff is informed and believes, and so alleges the fact to be, mingled with the said banking institution's assets and property and were not kept separate and apart as a trust fund. That the bonds so deposited were by said banking institution misappropriated and misapplied and used by said banking institution as its own and that all of said acts were done with the knowledge and acquiescence of the defendants, and each of them.

"3. That if any of said defendants did not have actual knowledge of such manner of handling, they would have had such knowledge had they performed their duties as prescribed by law. Plaintiff is informed and believes, and so alleges the fact to be, that the defendants, and each of them, had actual knowledge and acquiesced in the practice of said banking institution and its employees of commingling trust funds with other property of said banking institution and that said practice had been followed for several years prior to and during the period herein set forth."

Plaintiff concludes with a prayer for $11,000 and interest, the same as in the first cause of action.

This second cause of action is spoken of as being based upon the common-law liability, as distinguished from the first cause of

action, which was a statutory liability. However, this second cause of action includes all the allegations of the first by specific reference.

The pleader seems to rely almost exclusively upon the cases of *Sweet v. Bank,* 69 Kan. 641, 77 Pac. 538, and *Sweet v. Savings Bank,* 73 Kan. 47, 84 Pac. 542. These were two decisions in one case. The first judgment was reversed because of the instructions going too far. The last sentence of the second paragraph of this second cause of action in the case at bar contains some of the statements approved in the Sweet cases, but it is immediately followed by allegations as to the duty of officers which, being in the instructions, caused the reversal of the first Sweet case.

The first paragraph of this second cause of action stresses the official character of the defendants. One may while serving as an officer do a wrong, but his liability is personally under the common-law liability. Plaintiff cites the following language from the first Sweet case, as particularly applicable to the case at bar:

"Where there were sent to a corporation a note and mortgage, with instructions to collect and remit, and the money was collected but not remitted, a recovery may be had by the owner of the note and mortgage from the executive officers and managing agents having the active management, charge and control of the affairs of the corporation for the conversion of the money by them for the use of the corporation, and also a recovery from them for such conversion of the money by subordinates, with the knowledge and acquiescence of such officers and managing agents." (Syl. ¶ 3.)

The term "conversion" is found in this quotation and also in this second cause of action, but the part quoted above lays stress upon the instructions to collect and remit. The conversion in the present case appears to be bad official judgment or official action amounting to the conversion of a trust fund or bonds.

A more recent case, *Beeler & Campbell Supply Co. v. Riling,* 132 Kan. 499, 296 Pac. 365, was where officials of a corporation were attempted to be held personally liable for wrongs that had been done others with whom the corporation was dealing, and the following expression was given as to the law here under consideration:

"They may sue and be sued as trustees of the defunct corporation. (R. S. 17-808; *Kansas Wheat Growers Ass'n v. Markley,* 132 Kan. 156, 294 Pac. 885.) Such *ex officio* trustees have not *ipso facto* any personal responsibility for the debts, torts or delicts of the defunct corporation. (*Bank v. Reed,* 108 Kan. 176, 178, 194 Pac. 638; 195 Pac. 599.) But, on the other hand, it is quite true that officers or agents of a corporation, whether defunct or not, may be personally liable for tortious acts of the corporation in which they have willfully participated. (*Cameron v. K.-C. Com. Co.,* 22 Mont. 312, 74 A. S. R. 602; *M. E.*

R. Co. v. Kneeland et al., 120 N. Y. 134, 8 L. R. A. 253, and note; 17 A. S. R. 619, and note; *Hoffman v. Toft,* 70 Ore. 488, 52 L. R. A., n. s., 944; 7 R. C. L. 504-510; 14a C. J. 175, 176; id. 181 *et seq.;* Notes in 28 L. R. A. 433 *et seq.;* 25 L. R. A., n. s., 343 *et seq.;* 39 L. R. A., n. s., 901-903.)" (p. 505.)

It takes more than the tortious act of the corporation to make one who is an officer or managing agent of such corporation personally liable. (See *Noll v. Boyle,* 140 Kan. 252, 36 P. 2d 330.)

We think the second cause of action fails to state facts sufficient to state a cause of action.

The judgment is affirmed as to the first cause of action and reversed as to the second cause of action, and the cause is remanded with directions to sustain the demurrers to the second cause of action.

HARVEY, J., dissenting as to the ruling on the second cause of action.